IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**GRIFFIN E. HARRIS,**

    **Plaintiff,**

    v.

                         Civil Action 2:14-cv-1351
                         Judge Michael H. Watson
                         Magistrate Judge Elizabeth P. Deavers

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Griffin E. Harris, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 18), and the administrative record (ECF No. 19). For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

### I.    BACKGROUND

In his Statement of Errors, Plaintiff asserts that reversal is warranted on numerous grounds. The Undersigned finds the ALJ's failure to properly consider Plaintiff's school records warrants reversal. This finding obviates the need for in-depth analysis of Plaintiff's remaining

assignments of error.[1]  Thus, the Undersigned limits her discussion to evidence bearing on this error.

**A.    Plaintiff's 2008 Application**

On August 14, 2008, Plaintiff filed an application for supplemental security income, alleging a disability onset date of April 1, 2005.  (R. at 165.)  In a decision dated May 26, 2011 ("2011 Decision"), Administrative Law Judge Whitfield Haigler, Jr. ("ALJ Haigler") denied Plaintiff's 2008 application.  (R. at 162-75.)  ALJ Haigler found that Plaintiff had no severe cognitive impairments and consequently did not include any mental limitations into his residual functional capacity ("RFC") determination.  He also found that Plaintiff had "at least a high school education" as contemplated in the Medical-Vocational Guidelines.  (R. at 174.)  In making these determinations, ALJ Haigler found Plaintiff's allegations that he could not read or write or follow written instructions not credible, citing to a report from consultative examiner Alan White, Ph.D., and the absence of any evidence corroborating the low IQ scores reflected in the record.  (R. at 169.)  ALJ Haigler further explained that the IQ score of 50 obtained from Dr. White was not compelling given the evidence that Plaintiff provided only minimal effort.  He also found that the IQ score reflected in the opinion of Lawrence M. Smith was not compelling because "[i]t is unclear how valid his tests results are."  (R. at 173.)

Instead of appealing the 2011 Decision, Plaintiff opted to file a new application for supplemental security income in July 2011 ("2011 Application"), alleging that he has been

---

[1]Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignments of error if appropriate.

disabled since April 1, 2005, due to knee cartilage, back problems, stress, and depression. (R. at 216, 275–80, 331.)

**B.      New Evidence Submitted in Connection with Plaintiff's 2011 Application**

In connection with his 2011 Application, Plaintiff submitted his school records. These school records reflect that Plaintiff attended the Starlight Center though The Licking County Board of Developmental Disabilities from 1966 through 1977, when he was twenty-one years old. (R. at 394-412.) In 1966, when Plaintiff was in the fourth grade, he underwent Stanford-Binet IQ testing, which revealed an IQ score of 57. (R. at 395.) The evaluator noted that "little or no academic expectations would exist, and in truth, little achievement is present." (R. at 395.) The evaluator further noted that Plaintiff had "rather great difficulty in understanding spoken directions," and that he "becomes confused in simple number concept areas." (*Id*.)

In 1970, when Plaintiff was in junior high, he obtained a Stanford-Binet IQ score of 54. (R. at 396.) The evaluator noted that during testing, Plaintiff "sincerely tried to accomplish the tasks." (*Id*.) The evaluator classified Plaintiff as being "moderately retarded in intelligence" based upon both "observations and test results." (*Id*.) The evaluator further noted that even though Plaintiff was thirteen, his academic skills proved to be at the first-grade level. (*Id*.) In addition to these academic deficiencies, the evaluator noted that Plaintiff needed behavioral management education "to help him learn more acceptable social behaviors and limit his activity in any group situation." (*Id*.) A psychological examination performed three months before Plaintiff turned fourteen reflected that he had the "developmental level physically, socially, and intellectually equal to that of a[n] *eight* year old child." (R. at 397.) It was noted that Plaintiff

3

was motivated to do well and was cooperative during testing.  (R. at 398.)  He was classified as moderately retarded.  (R. at 397.)

When Plaintiff was fifteen, he underwent evaluation for training of mentally retarded persons.  (R. at 400.)  He was again classified as moderately retarded.  It was noted that "[a]fter observation and examination," he appeared to have the developmental level of an eight-and-a-half year old.  (*Id*.)  He obtained a Stanford-Binet IQ score of 51.  (R. at 402.)  The evaluator noted that Plaintiff was "functioning within the TMR [trainable mentally retarded] range of intelligence."  (*Id*.)  Although he was fifteen, it was noted that his learning expectancy level was at the first-grade level.  (R. at 402, 403.)

Plaintiff's "TMR Performance Profile for the Severely and Moderately Retarded Record Booklet" reflected that he obtained an IQ score of 49 when he was seventeen years old.  (R. at 406.)  The Record Booklet further reflects that he again obtained an IQ score of 49 when he was nineteen years old.  (R. at 408.)

A progress report dated June 1975, when Plaintiff was eighteen years old, reflected that he could not tell time and that he "need[ed] very much work in obeying authority."  (R. at 409.)  A progress report dated June 1977, when Plaintiff was twenty years old, indicates that he had improved in his self care and described his practical skills as good, noting that he could pump gas.  (R. at 412.)  The report further described Plaintiff's basic knowledge as "fair," noting that he could not identify words well, that he "cannot read," and that he had only "simple number skills."  (*Id*.)  Plaintiff graduated from the Starlight Center in 1977 at age twenty one.  (R. at 394.)

## C. Consultative Examination With Dr. White

In August 2011, Plaintiff presented to Dr. White for a mental evaluation in connection with his 2011 Application for benefits.[2] He reported that he had completed high school with enrollment in special education classes. (R. at 761.) Dr. White described Plaintiff's social skills as "within the below average range" and further noted that his "ability to deal with social situations and the understanding of consequences [was] in the poor range." (R. at 762–63.) He noted that Plaintiff could not perform a serial seven subtraction task or a serial three subtraction test. (R. at 763.) Dr. White's evaluation also reflected that Plaintiff was unable to spell a five-letter word forward and/or backward. In addition, Dr. White noted that Plaintiff was unable to respond appropriately to any comprehension questions, that he was unable to explain or interpret individual proverbs, that he was unable to identify similarities between four sets of items, and that his abilities of abstraction and identification were in the poor range. (*Id*.) Dr. White nevertheless opined that Plaintiff had no impairment in understanding in applying instructions; in maintaining concentration, persistence, and pace; and in responding appropriately to supervision and co-workers. (R. at 764.) He further opined that Plaintiff would experience mild impairment to workplace pressures due to his issues with depression. (R. at 765.)

## D. Plaintiff's July 2011 Application

Plaintiff's July 2011 Application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Paul E.

---

[2] Dr. White's earlier evaluation of Plaintiff upon which ALJ Haigler relied is not part of the record for Plaintiff's 2011 Application.

Yerian ("ALJ Yerian") held a hearing on November 9, 2012, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 129–58.)

Plaintiff testified that he took special education classes through the twelfth grade.  (R. at 132.)  He indicated that when he looked for employment in the past, his sister filled out the applications for him.  (R. at 133.)  Plaintiff testified that while in prison, his job assignment was to move food from the kitchen to the serving line.  (R. at 137.)  When ALJ Yerian asked Plaintiff about whether he received written or oral instructions for his prison job assignment, Plaintiff responded that he could not "go by written instructions" and that they had to repeat the oral instructions to him every day.  (R. at 138.)  When asked if he could read, Plaintiff responded that he could "read very little."  (*Id*.)  When ALJ Yerian followed up by asking if he could read a grocery list, Plaintiff responded, "[n]o."  (R. at 139.)  Upon further questioning from ALJ Yerian, Plaintiff stated that he would be unable to read a note from a roommate saying that he went to the store because "it would be too long a words for me to read it."  (*Id*.)  He further said that he would be unable to write a note saying that he went to the library because he "can't write that well" and "can't spell that good either."  (*Id*.)  Plaintiff testified that he had a cell phone, but that he could not text.  (R. at 155.)

On January 23, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 84-114.)  In reaching this decision, ALJ Yerian found that the school records were not material and therefore concluded that he was bound by ALJ Haigler's decision findings under Acquiescence Ruling 98-4(6) and *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997).  (R. at 87-88.)  At step one of the sequential evaluation process, the ALJ Yerian found that Plaintiff had not engaged in

6

substantially gainful activity since the June 23, 2011 application date.[3]  ALJ Yerian found as ALJ Haigler had that Plaintiff had no severe mental or cognitive impairments.  (R. at 90.)  He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 100.)  At step four of the sequential process, ALJ Yerian found as ALJ Haigler had that Plaintiff could perform medium work.  ALJ Yerian consequently did not include any mental limitations in his RFC determination.  ALJ Yerian also found that Plaintiff has no past relevant work, noting that his earnings record reflected no more than $1,630.13 in income in the fifteen years prior to the application date.  (R. at 111.)  He further found that Plaintiff "has at least a high school education and can communicate in English" as contemplated in the Medical-Vocational Guidelines.  (*Id.*)

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

In support of his determination that Plaintiff's allegations of cognitive impairments and limited or inability to read and write were not credible, ALJ Yerian adopted ALJ Haigler's analysis, pasting from his opinion into the decision. As set forth above, ALJ Haigler discounted Plaintiff's allegations as not credible based upon a report from consultative examiner Dr. White[4] and the absence of any evidence corroborating the low IQ scores reflected in the record. (R. at 169.)

ALJ Yerian offered only the following limited discussion of the school records Plaintiff submitted in connection with his 2011 Application:

> The [Plaintiff] submitted school records of IQ testing when he was age 13 and 15 in an effort to establish [borderline intellectual functioning] since the date of the previous ALJ decision.
>
> Section 112.00 of the Childhood Mental Disorders Listings states that IQ test results must be sufficiently current for accurate assessment under the Listings. Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages seven and 16 should be considered current for four years when tested IQ is less than 40, and for two years when IQ is 40 or above.
>
> There is no evidence documenting [borderline intellectual functioning] since the date of the previous ALJ decision given that [Plaintiff's] childhood IQ scores are only valid for two years from the date of testing, which precedes the date of the previous ALJ decision by over 30 years. Accordingly there is no objective evidence documenting impaired intellectual functioning since the date of the previous ALJ decision in this case.

(R. at 99 (internal citations to the record omitted).)

Relying on ALJ Haigler's decision and prior testimony from a vocational expert, ALJ Yerian concluded that Plaintiff can perform jobs that exist in significant numbers in the national

---

[4] Despite ALJ Yerian's reliance upon Dr. White's analysis, the report from Dr. White that ALJ Haigler references and relies upon is not part of the record for Plaintiff's 2011 Application.

8

economy. (R. at 111-13.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 113.)

On July 1, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–6.) Plaintiff then timely commenced the instant action.

## II. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

9

1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### III.    ANALYSIS

Review of ALJ Yerian's decision makes clear that he failed to properly consider portions Plaintiff's school records.  For example, he found the school records to be immaterial, incorrectly concluding that "there is no objective evidence documenting impaired intellectual functioning since the date of the previous ALJ decision in this case."  (R. at 99.)  He reasoned that the school records reflected only IQ testing when Plaintiff was age 13 and 15.  Contrary to this finding, in addition to the low IQ scores ALJ Yerian referenced, the record reflects that Plaintiff obtained an IQ score of 49 when was seventeen and again obtained an IQ score of 49 at age nineteen.  (R. at 406, 408.)

ALJ Yerian also improperly adopted ALJ's Haigler's conclusions and analysis concerning Plaintiff's allegations of a cognitive impairment and difficulty with reading and writing given that ALJ Haigler relied heavily upon the absence of corroborating evidence to discount Plaintiff's allegations.  Contrary to ALJ Yerian's implicit finding, the school records Plaintiff submitted in connection with his 2011 Application supply ample evidence corroborating Plaintiff's allegations.  For example, based upon both observation and his low IQ scores, Plaintiff was consistently diagnosed as moderately retarded and was found to be functioning within the trainable mentally retarded range of functioning.  (R. at 396, 397, 400, 402.)  In

addition, his records reflect that he attended a school for children with intellectual disabilities and was placed in a program for the trainable mentally retarded. When Plaintiff was fifteen, he exhibited a learning expectancy level at the first-grade level. (R. at 402, 403.) At age eighteen, he still could not tell time. (R. at 409.) Upon his graduation at age twenty-one, Plaintiff was praised for his ability to pump gas, but he still could not identify words well, could not read, and possessed only simple number skills. (R. at 412.)

The Undersigned cannot conclude that the ALJ's failure to properly consider Plaintiff's school records amounts to harmless error for numerous reasons. First, as Plaintiff points out, given his age, the RFC's limitation to medium work, and his absence of previous work, if he is determined to have a limited education or less as contemplated in the Medical-Vocational Guidelines, he would be considered disabled under Medical-Vocational Grid Rule 203.10. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 203.10.

The regulations set forth descriptions of various education categories to assist the Commissioner in evaluating a claimant's educational level. 20 C.F.R. § 416.964(b)(1)-(6). The regulations define "illiteracy," "marginal education," "limited education," and "high school education" as follows:

> (1) Illiteracy. Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.
>
> (2) Marginal education. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.
>
> (3) Limited education. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational

11

> qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.
>
> (4) High school education and above. High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. We generally consider that someone with these educational abilities can do semi-skilled through skilled work.

20 C.F.R. § 416.964(b)(1)-(3).  The regulations further advise as follows:

> [T]he numerical grade level that you completed in school may not represent your actual educational abilities. These may be higher or lower. However, if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities. The term education also includes how well you are able to communicate in English since this ability is often acquired or improved by education.

20 C.F.R. § 416.964(b).

In the instant action, in finding that Plaintiff "has at least a high school education" as contemplated under the regulations, ALJ Yerian necessarily concluded that Plaintiff's repeated allegations concerning his cognitive abilities and abilities to read and write were not credible. Plaintiff's school records, considered in their entirety, could support the conclusion that the numeric grade level he completed did not represent his actual education abilities and that he had a limited education level or less, which, as set forth above, would mandate a finding of disabled.

Second, the ALJ's failure to properly consider Plaintiff's school records cannot be considered harmless error because ALJ Yerian's adverse credibility determination on these issues is not otherwise supported by substantial evidence.  *See Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013) (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012)) ("[E]ven if an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the ALJ's decision will

12

be upheld as long as substantial evidence remains to support it."). Rather, in addition to Plaintiff's school records, other record evidence could support the conclusion that the numeric grade level he completed did not represent his actual education abilities and that he had a limited education level or less. For example, Dr. White's report from his 2011 consultative examination of Plaintiff reflected that Plaintiff was unable to spell a five letter word, perform a serial seven or serial three subtraction test, or respond appropriately to any comprehension questions. (R. at 763.) In addition, a record from Southeastern Correctional Institution's Mental Health Services noted that Plaintiff "had poor reading and writing skills." (R. at 491.) Thus, because the ALJ's decision on credibility must be "based on a consideration of the entire record"—which ALJ Yerian failed to do—and "the ALJ, and not the reviewing court, [must] evaluate the credibility . . . of the claimant," *Rogers*, 486 F.3d. at 247, remand is appropriate.

## IV.  CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g). Accordingly, the Undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## V.  PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  July 13, 2015                                                /s/ *Elizabeth A. Preston Deavers*
                                                                                               Elizabeth A. Preston Deavers
                                                                                               United States Magistrate Judge